IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. CR-21-139-SLP |
| ) | |
| BRANDON ONEAL GWYNN, ) | |
| ) | |
| Defendant. ) | |

**DEFENDANT BRANDON GWYNN'S MOTION TO SUPPRESS
EVIDENCE and BRIEF IN SUPPORT**

Brandon Oneal Gwynn, defendant, by and through his attorney, Assistant Public Defender Julia Summers, respectfully moves this Court for an order to suppress the illegally obtained physical evidence, oral statements, and fruits thereof, resulting from the unlawful stop and search of the vehicle in which he was a passenger. This combined Motion and Brief is submitted in conformity with LCrR 12.1(d) and (e) and in conformity with FED. R. CRIM. P. 12(b)(3).

*The Indictment*

Mr. Gwynn is charged along with his ex-wife, Valena Alicia Acosta-Gwynn, in a two-count indictment which alleges in Count 1 that they knowingly and intentionally conspired to possess with intent to distribute 500 grams or more of a mixture containing methamphetamine, in violation of 21 U.S.C. §§841(a)(1) and 846, and in Count 2 that they knowingly and intentionally possessed with intent to distribute 500 grams or more of a

mixture containing methamphetamine, in violation of 21 U.S.C. §841(a)(1); the penalty for both counts is found at 21 U.S.C. §841(b)(1)(A). (Ms. Acosta-Gwynn is not a party to this motion, as she has pled guilty to Count 1 of the Indictment, with a plea agreement, and sentencing is pending. *See Docs. 35-38.)*

## *Facts*

This case arose from a traffic stop conducted on Interstate 35 near the Turner Turnpike exit in Oklahoma City on August 9, 2020. The following facts are taken from law enforcement reports provided in discovery and the forward-looking and inward-looking videos recorded by the cameras mounted in the highway patrol officer's vehicle.

On August 9, 2020, Oklahoma County Sheriff's Office (OCSO) Deputy Zamudio observed a Dodge Durango traveling northbound on I-35 in Oklahoma City. He stated the vehicle bore a temporary dealer tag which was "obstructed by a tinted plastic cover." He reported he ran the temporary tag number on OLETS and it came back to an "International Truck out of Kentucky." Then, he reported, he saw the vehicle made an unsafe lane change by "not signaling 100ft before changing lanes." Deputy Zamudio pulled behind the vehicle and pulled it over on the shoulder between the Turnpike exit and NW 122nd Street.

Deputy Zamudio first advised the driver (Ms. Acosta-Gwynn) of the supposed tag violation. Then, he told Ms. Acosta-Gwynn and passenger Mr. Gwynn that he smelled and saw marijuana. Although Deputy Zamudio had purportedly pulled the vehicle over for a traffic violation, he took Mr. Gwynn, the passenger, back to his patrol car to question first. Mr. Gwynn told Deputy Zamudio the Durango belonged to his grandmother (whose surname,

Gwynn, appeared on the lease paperwork in the vehicle), and that none of the bags in the vehicle belonged to him.

Deputy Zamudio decided a search of the vehicle was needed and called for assistance. He then returned to the Durango and asked the driver questions. She explained they were returning to Kentucky from Arizona, the vehicle belonged to Mr. Gwynn's grandmother, and that the marijuana was hers. Separately, Deputy Zamudio asked both for consent to search, and both declined. He then informed Ms. Acosta-Gwynn that he did not need consent because he saw and smelled the marijuana joint. He called for a drug-sniffing dog.

Deputy Zamudio's patrol car was parked immediately behind the Durango, such that his dashcam captured the initial search. Within moments of the call, Deputy Williams arrived with the K9, Cairo, who alerted to the rear of the vehicle. Within seconds, officers opened up the rear cargo area, opened a gray suitcase or duffel, and turned to face the dashcam and gave enthusiastic thumbs-up. They parted, which gave the dashcam a view of several bags presumed to contain methamphetamine.

Rather than continuing with the search at that time and location, someone decided to conduct a "secondary search of the vehicle at the CITCO office." And, instead of calling for a wrecker to tow the vehicle, which would have entailed an inventory of the vehicle's contents, OCSO deputy Gradick drove the Durango to the CITCO office. At that location two deputies proceeded to search the Durango. They purportedly found heat-sealed bags of methamphetamine, heat-sealed bags of marijuana, pills labeled as oxycodone (which the lab report states turned out to contain fentanyl), small jars of marijuana, and THC gummies.

Following the Miranda warning, Ms. Acosta-Gwynn admitted to investigators she was transporting drugs. She took full responsibility for this, and admitted to making two prior trips in which she transported drugs. She insisted that Mr. Gwynn was not involved and did not know what she was doing until she told him shortly before the stop. Law enforcement did not examine her cell phone(s) or Mr. Gwynn's to determine whether either might contain information helpful to the investigation – for example, to corroborate Ms. Acosta-Gwynn and exculpate Mr. Gwynn.

Defense specifically requested disclosure of photographic images and video recordings of the second search, but was told these do not exist. Regardless of the fact this *second* search was conducted in a law enforcement facility which contained or should have contained the simple equipment necessary to memorialize the search, the deputies did not avail themselves or make the effort to record their search. They made a simple diagram (which was provided in discovery) showing roughly where the various illegal items were found in the vehicle, but this diagram fails to provide any useful detail surrounding these that would have important bearing on evidentiary issues.

Numerous times throughout their reports of the incident, the participating officers refer to both CITCO and COMIT. Undersigned counsel believes COMIT was replaced by CITCO, and it is unknown if these officers were conducting this vehicle stop, seizure, and searches in accordance with COMIT procedures and protocols, CITCO procedures and protocols, or not, or if there is any distinction between these. Defense has requested discovery of the relevant portions of the policy and protocol manuals for each task force as

this may have bearing on whether they followed task force and/or law enforcement agency procedures.

## *Summary of the Argument*

This case involves a traffic stop and the seizure of evidence from a vehicle in which Mr. Gwynn was a passenger. In his reports, Deputy Zamudio offered two different reasons for stopping the Durango, neither of which was factually accurate. Thus, the stop was invalid from the outset in violation of the Fourth Amendment. Even if the stop was initially justified, the second search violated Mr. Gwynn's rights under the Fourth Amendment because it was undertaken without first obtaining a search warrant, under circumstances which were not exigent. All evidence obtained as a result of this violative seizure and searches must be suppressed.

## *Argument and Authorities*

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." Stopping an automobile and detaining its occupants constitutes a seizure under the Fourth Amendment, even though the purpose is limited and the resulting detention brief. *Delaware v. Prouse,* 440 U.S. 648, 653 (1979). A passenger in a vehicle subject to a traffic stop is seized for Fourth Amendment purposes. A passenger is entitled to challenge the basis for a stop and the reasonableness of the officer's action in relation to the stop. *Brendlin v. California*, 551 U.S. 249 (2001).

A traffic stop will be deemed valid at its inception if the officer has reasonable

suspicion to believe there was a violation of an applicable traffic regulation justifying the stop. To meet its burden of showing reasonable suspicion, the government must prove the officer had "a particularized and objective basis for suspecting" a violation occurred. *United States v. Cortez,* 449 U.S. 411, 417 (1981). To sustain the stop in the instant case, the evidence must show Deputy Zamudio articulated specific facts showing he had a reasonable suspicion the driver of the Durango was operating the vehicle with an improper tag and that the vehicle did not signal an intended lane change 100 feet prior to moving over. The "whole picture" must be taken into account." *Id.*

      The Supreme Court articulate two elements that must be met to sustain a finding of a particularized suspicion. First, the assessment must be based upon all circumstances. *Cortez,* 449 U.S. at 418.

> The analysis proceeds with various objective observations, information from police reports, if such are available, and consideration of the modes or patterns of operation of certain kinds of lawbreakers. From these data, a trained officer draws inferences and makes deductions – inferences and deductions that might well elude an untrained person.

*Id.*

      The second element requires that the process described in the first element "raise a suspicion that the particular individual being stopped is engaged in wrongdoing." The Court emphasizes "'[t]his demand for specificity in the information upon which police action is predicated is *the central teaching of this Court's Fourth Amendment jurisprudence.'" Id., quoting Terry v. Ohio,* 392 U.S. 1, 21 (1968).

      The evidence in this case does not meet these requirements. What first drew Deputy

Zamudio's attention to the Durango appears to have been the out-of-state temporary tag. He first stated the tag appeared to be obscured by a tinted plastic cover. The dashcam video and photographs contradict this: the paper tag information was not obscured by the protective cover, and the cover was not tinted (the temporary tag was blue). Nonetheless, Deputy Zamudio was able to discern the state of issuance and the numbers, and ran these on OLETS. He states they came back to an International truck. This was impossible. If he entered the letters and numbers correctly, they would have come back to the dealer, not to any particular vehicle – much the same way as temporary dealer tags work in Oklahoma. So, either Deputy Zamudio entered the tag information incorrectly – in which case he should have questioned *his* accuracy due to the nature of temporary dealer tags – or, he made up the story about an International truck in order to justify stopping the Durango. The defense has been provided no documentation such as an OLETS print-out or photo capture or screenshot of the supposed OLETS search and result. The only evidence we have is the assertion of Deputy Zamudio, which was demonstrably factually wrong. This will be developed through testimony at a suppression hearing.

Deputy Zamudio's second stated reason for stopping the Durango also fails. The objective fact from the dashcam video shows that the turn signal is blinking before the Durango changed lanes. Deputy Zamudio alleged the signal was not engaged for the required 100 feet prior to moving into the next lane. However, according to the Speed Distance Time Calculator at Calculator Soup Online Calculators on line, an item traveling at 60 miles per hour will travel 100 feet in one second. Deputy Zamudio did not allege a

speeding violation, so we can infer the Durango was traveling more or less at the speed limit, which should be at least 60mph along that stretch of I-35. Furthermore, northbound traffic flow definitely would not be impacted by rush hour traffic at 10:35 a.m. in that location. So it is fair to assume the Durango was traveling roughly 60 miles per hour, if not more, and thus would cover 100 feet in one second or less. Which is clearly covered by the blinking turn signal in Deputy Zamudio's dashcam video.

Although "[a]n officer's reasonable mistake of fact, as distinguished from a mistake of law, may support the probable cause or reasonable suspicion necessary to justify a traffic stop...[, an officer's] failure to understand the plain and unambiguous law he is charged with enforcing...is not objectively reasonable." *United States v. DeGasso,* 369 F.3d 1139, 1144-45 (10th Cir. 2004). Deputy Zamudio's incorrect assertions that (1) the Durango's temporary dealer tag was registered to an International truck and (2) that the driver of the Durango committed a traffic violation for failing to signal 100 feet prior to changing lanes are not objectively reasonable. This invalidates the entire stop and the evidence obtained therefrom.

Even if Deputy Zamudio had articulated an acceptable basis for stopping the Durango, a significant part of the ensuing search violated the Fourth Amendment. Defense grants that upon seeing and smelling burning marijuana upon approaching the vehicle, Deputy Zamudio would have a sufficient basis to search due to the fact neither occupant possessed an Oklahoma medical marijuana card; at the very least, he could have arrested the occupants for that misdemeanor and called in a wrecker which would have occasioned an inventory of the vehicle's contents. However, he did not proceed that way. He called in a K9 officer. Upon

receiving the dog's alert, officers opened up the rear hatch and immediately discovered several sealed packages of methamphetamine in a suitcase. Instead of continuing the search there, however, or calling in a wrecker to move the vehicle to a safe spot, one of the deputies himself drove the Durango to the task force office.

At the task force office, the Durango was in a secure location, accessible only to authorized persons and guarded by law enforcement. There was no risk of imminent danger to police or the public, no risk of destruction or deterioration of evidence, and no risk of escape of the suspects. No exigent circumstance existed that would make the warrant requirement impractical. "Once the emergency ends...the police must obtain a warrant to conduct further searches." *See generally, Mincey v. Arizona,* 437 U.S. 385 (1978). Instead of seeking a search warrant, however, the deputies proceeded to search a second time and purportedly located various illegal controlled substances in different bags in the cargo area of the vehicle (not counting the marijuana joint found at the outset of the stop in the front seat passenger area).

The government may attempt to assert that the evidence at issue would have inevitably been found and seized through a search warrant. However, the inevitable discovery doctrine cannot excuse the failure to obtain a warrant under the circumstances present in this case. There was no independent investigation pending that inevitably would have led to the discovery of the remaining evidence. *See United States v. Larsen,* 127 F.3d 984, 986 (10th Cir. 1997). To forgive law enforcement of its obligation to obtain a search warrant in this case "would completely obviate the warrant requirement of the Fourth Amendment." *United*

*States v. Echegoyen,* 799 F.2d 1271, 1280 fn. 7 (9th Cir. 1986).

## **Conclusion and Relief Requested**

When the legality of a traffic stop and the propriety of a warrantless seizure and search are challenged, as in this case, an evidentiary hearing is required. The United States bears the burden of proving, first, that Deputy Zamudio had a particularized and objective basis for suspecting a traffic or other law violation occurred, and second, that some exception to the Fourth Amendment's warrant requirement existed to permit the second search of the Durango once it was removed from the highway to a secure location. If the government does not meet its burden as to the basis for the stop in the first place, then none of the illegally obtained material seized may be admitted at trial. Alternatively, if the government does not meet its burden as to the second warrantless search, then none of the evidence obtained as a result of that search may be admitted at trial. Counsel furthermore requests the opportunity to submit additional authority on these issues should the need become apparent.

Respectfully submitted,

 s/ Julia C. Summers
JULIA C. SUMMERS, OBA #15851
Assistant Federal Public Defender
215 Dean A. McGee, Suite 109
Oklahoma City, OK 73102
Phone:          (405) 609-5930
Fax:               (405) 609-5932
E-mail:          julia_summers@fd.org
COUNSEL FOR DEFENDANT,
BRANDON ONEAL GWYNN

<u>CERTIFICATE OF SERVICE</u>

    I hereby certify that on this 25th day of March, 2022, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to Assistant United States Attorney Danielle Connolly.

                                       s/ Julia C. Summers
                                       JULIA C. SUMMERS