# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| UNITED STATES OF AMERICA,      ) | |
|                   Plaintiff,  ) | |
|          -vs-            ) | No. CR-21-139-SLP |
| BRANDON ONEAL GWYNN,      ) <br>   a/k/a Derrick Lamont Bullitt,   ) | |
|                  Defendant.  ) | |

## UNITED STATES' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO SUPPRESS

The United States of America, by Robert J. Troester, United States Attorney for the Western District of Oklahoma, and Danielle M. Connolly, Assistant United States Attorney, hereby responds in opposition to Defendant's Motion to Suppress. (Doc. 59.) For the reasons set forth below, the Government submits that Defendant's Motion should be denied.

## FACTUAL BACKGROUND

On August 9, 2020, Oklahoma County Sheriff's Deputy Andrew "Zach" Zamudio was working traffic enforcement near I-35 and Wilshire Avenue in Oklahoma City as part of his assignment to the Criminal Interdiction Team of Central Oklahoma (CITCO).[1] At

---

[1] CITCO is a joint task force of the Oklahoma County Sheriff's Office and Oklahoma City Police Department. It was previously known as Central Oklahoma Metro Interdiction Team (COMIT) while it included investigators from the Oklahoma County District Attorney's Office. The facts contained in this section are gathered from a report authored by Dep. Zamudio following the traffic stop (Exhibit 1) and the footage of the traffic stop

approximately 10:34 a.m., he observed a dark blue 2020 Dodge Durango SRT traveling northbound on I-35 with a Kentucky temporary tag obstructed by a tinted plastic cover.[2] (Ex. 1 at 2; *see generally* Ex. 2.)  When he ran the tag number, A510517, through the Oklahoma Law Enforcement Telecommunications System (OLETS), the return came back to an International Truck registered in Kentucky. (Ex. 1 at 2; Ex. 2 at 01:02-01:10.) Dep. Zamudio, traveling behind the Durango, observed the vehicle signal a lane change to exit onto the Turner Turnpike eastbound as it moved into an outer lane, failing to travel 100 feet before changing lanes. (*Id.;* Ex. 2 at 00:22-00:26.)  He activated his emergency equipment and initiated a traffic stop on the side of I-35 between the Turner Turnpike and 122nd Street. (Ex. 1 at 2; Ex. 2 at 00:29.)

Dep. Zamudio made contact with the occupants of the vehicle, advising them of the tag violation before the driver, Valena Acosta-Gwynn, became hostile and aggressive. (Ex. 1 at 2; Ex. 2 at 01:02-01:16.)  The front-seat passenger, Defendant, who had been pretending to sleep, began to act as though he was waking up. (Ex. 1 at 2.) Dep. Zamudio noticed a strong odor of marijuana coming from the interior of the vehicle and observed a

---

recorded by an outward-facing dashboard-mounted camera affixed to his patrol unit (Exhibit 2, which will be submitted to the Court on a DVD). Dep. Williams' report is appended as Exhibit 3. Exhibits 4 and 5 are reports of analyses of drug evidence submitted to the Drug Enforcement Administration (DEA). It should be noted that upon activation of the emergency lights, the siren, or both, on an Oklahoma County Sheriff's Office (OCSO) patrol unit, the vehicle's dashboard-mounted camera will begin to record audio and video footage and will capture the 30 seconds of video immediately before activation.

[2]   A blue tint to the tag is visible as captured by the dashcam. (*See generally* Ex. 2.)

marijuana cigarette in plain view.[3] (*Id.*; Ex. 2 at 01:15-01:22.) When he advised that he could smell and see marijuana in the vehicle, Acosta-Gwynn rolled her eyes, placed her earbud back in her ear, and made a motion with her head toward Defendant to indicate that it belonged to him. (Ex. 1 at 2.) Defendant attempted to throw a plainly visible marijuana cigarette out the window, but Dep. Zamudio stopped him, requested his identification, and asked him to exit the vehicle. (*Id.*; Ex. 2 at 01:29-02:18.) Defendant was patted down and placed in the back seat of the patrol car, where he stated that the marijuana belonged to the driver. (Ex. 1 at 2; Ex. 2 at 02:18-02:57.) Dep. Zamudio returned to the Durango to speak with Acosta-Gwynn (Ex. 1 at 2; Ex. 2 at 03:05) before requesting that additional officers respond to his location (Ex. 1 at 2; Ex. 1 at 04:17-04:26).[4] Oklahoma County Corporal Joshua Gradick and Deps. Justin Barton and Steven Lira arrived on scene shortly thereafter.[5] (Ex. 1 at 2.)

---

[3] Speaking to the defendants at the front passenger window 15 seconds into the conversation, Dep. Zamudio is recorded saying, "let's talk about this marijuana, the marijuana I smell and see." (Ex. 2 at 01:15-01:22.)

[4] Acosta-Gwynn claimed that the Durango belonged to Defendant's grandmother, denied that there was anything else illegal in the vehicle, refused to grant consent to search, and remained defiant throughout her contact with the deputies. (Ex. 1 at 2; Ex. 2 at 05:39-06:25.) She was ultimately secured in the back of Dep. Lira's patrol car. (Ex. 1 at 2; Ex. 2 at 06:26.)

[5] While the report and video do not indicate the precise time of arrival of additional deputies, Dep. Zamudio referenced his "partner's car" at 06:26 while shepherding Acosta-Gwynn to the backup patrol unit. (*See generally* Ex. 1; Ex. 2 at 06:26.) He then updated his partners regarding his observations and the information conveyed by Acosta-Gwynn. (Ex. 2 at 06:47-07:22.) Thereafter, Defendant advised that the vehicle belonged to his (or Acosta-Gwynn's grandmother, referencing the state of their marriage (*Id.* at 08:50-08:57), and also denied consent to search (*Id.* at 09:17-09:19).

Dep. Jonathan Williams also arrived with his state-certified canine partner, Cairo, who was deployed for an open-air sniff around the Durango. (Ex. 1 at 2; Ex. 2 at 09:28-09:40; Ex. 3 at 2.) Cairo immediately alerted to the odor of narcotics (Ex. 1 at 2; Ex. 2 at 09:36-09:38; Ex. 3 at 2) and deputies on scene conducted a roadside probable cause search of the vehicle (Ex. 1 at 2; Ex. 2 at 09:44-10:03; Ex. 3 at 2). Dep. Barton lifted the rear hatch, opened a gray suitcase, and within seconds observed packages containing a large amount a white crystal-like substance that the deputies believed to be methamphetamine. (Ex. 1 at 2; Ex. 2 at 09:56-10:03; Ex. 3 at 2.) The search was suspended (Ex. 1 at 2; Ex. 2 at 10:22), both subjects were arrested (Ex. 1 at 2; Ex. 2 at 10:27-10:51), and the Durango and both defendants were transported back to the CITCO office (Ex. 1 at 3; Ex. 3 at 2).[6]

Deps. Barton and Williams completed a secondary search of the Durango at the CITCO office, assisted by Dep. Zamudio who initialed, weighed, and fingerprinted each package as it was removed from the vehicle.[7] (Ex. 1 at 3; Ex. 3 at 2.) Dep. Williams field tested the white crystal-like substance at the CITCO office, which yielded a presumptive positive for methamphetamine. (Ex. 3 at 2.) In all, the deputies located 33 heat-sealed packages of methamphetamine weighing approximately 67.5 pounds.[8] (Ex. 1 at 3; Ex. 4.)

---

[6] Cpl. Gradick locked his patrol car and drove the suspect vehicle back to the office followed by Dep. Zamudio to ensure that the evidence remained secure. (Ex. 1 at 3.)

[7] Dep. Zamudio noted in his report that "[n]o collectible fingerprints were located on the packaging." (Ex. 1 at 3.) Cpl. Gradick completed interviews. (*Id.*)

[8] The substance (gross weight 30.72 kilograms, net weight 27.047 kilograms) was subsequently submitted to a Drug Enforcement Administration (DEA) laboratory for testing, where it was confirmed that it is in fact methamphetamine with a reported

4

They also seized 16 heat-sealed packages of marijuana weighing approximately 15.5 pounds, five plastic bags of counterfeit oxycodone pills, three packages of THC gummies, and 45 jars of pre-packaged retail marijuana weighing approximately 189 grams.[9] (Ex. 5.)

## PROCEDURAL BACKGROUND

On June 1, 2021, a federal grand jury returned an Indictment charging Defendant in a two-count Indictment with Drug Conspiracy and Possession of Methamphetamine with Intent to Distribute, in violation of 21 U.S.C. §§ 846 and 841(a)(1), respectively.[10] (Doc. 1.) He appeared for arraignment before the Honorable Amanda Maxfield Green on January 10, 2022, at which time Defendant's case was set for jury trial before this Court on March 8, 2022.[11] (Doc. 48.) On March 1, 2022, the Court granted Defendant's Unopposed Motion to Continue Jury Trial, striking the case from the March 2022 trial docket and resetting it on the Court's April 2022 trial docket. (Docs. 54-56.) Defendant's Motion also requested an extension of time within which to file preliminary trial documents. (Doc. 54.)

---

substance purity of 100 percent. (Ex. 4.) To date, this is the largest seizure of methamphetamine in the history of this task force.

[9] The counterfeit oxycodone pills (gross weight 544.4 grams, net weight 519.7 grams) were analyzed at a DEA laboratory, where it was confirmed that they contain fentanyl. (Ex. 5.)

[10] Valena Acosta-Gwynn was charged in both counts of the Indictment as well. She appeared before the Court on October 12, 2021, entering a plea of guilty to Count 1. (Doc. 35.) The Government has agreed to dismiss Count 2 as to Defendant Acosta-Gwynn at her sentencing hearing, which has not yet been docketed.

[11] Defendant was in law enforcement custody in New Mexico at the time the Indictment was filed and he was transported to Kentucky for the disposition of another criminal matter thereafter. He was finally transported to the Western District of Oklahoma pursuant to a Writ of Habeas Corpus Ad Prosequendum. (*See* Docs. 16-18, 40-41, and 52.)

The Court found "excessive the request to extend the deadline for pretrial motions and notices to April 1, 2022, and instead extend[ed] the deadline to March 25, 2022."[12] (Doc. 56 at 2.) Defendant filed his Motion to Suppress on March 25, 2022. (Doc. 59.)

On March 31, 2022, the Court granted Defendant's second Unopposed Motion to Continue Jury Trial, striking the case from the April 2022 trial docket and resetting it on the Court's May 2022 trial docket. (Docs. 60, 62-63.) Defendant's Motion also requested an extension of the deadline for the Government's response to Defendant's Motion to Suppress to April 22, 2022. (Docs. 59 and 60.) The Court found "excessive the request to extend the government's deadline to respond to the motion to suppress and instead extend[ed] that deadline to April 11, 2022." (Doc. 63 at 2.) The United States responds to Defendant's Motion to Suppress herein.

## ARGUMENT

### I. A Traffic Stop is Valid If Based on an Observed Traffic Violation.

While the traffic stop performed on the Durango was justified by several observed traffic violations, Defendant's Motion challenges the factual accuracy of the reasons underlying Deputy Zamudio's actions. (Doc. 59 at 5.) He asserts that Dep. Zamudio's report that the "tag appeared to be obscured by a tinted plastic cover" was contradicted by

---

[12] On March 29, 2022, Defendant filed a Motion seeking retention of 15 pages of discovery materials, consisting of six law enforcement reports "describing the August 9, 2020[,] vehicle stop, arrests, and search of the vehicle" and a "single page contain[ing] a preprinted diagram of an SUV or van interior, with markings made by law enforcement roughly depicting where they found items of evidentiary value, and describing those evidentiary items." (Doc. 61 at 2.) The Government responded in opposition on April 4, 2022. (Doc. 66.)

the "dashcam video and photographs," and that "the paper tag information was not obscured by the protective cover, and the cover was not tinted (the temporary tag was blue)." (*Id.*) He also claims that it "was impossible" that the combination of numbers and letters on the temporary tag "came back to an International truck" and that "[i]f he entered the letters and numbers correctly, they would have come back to the dealer, not to any particular vehicle." (*Id.*) Defendant provides speculative calculations to attempt an attack on the veracity of Dep. Zamudio's observation of the second traffic violation, failure to signal 100 feet before changing lanes. (*Id.*)

"'[A] traffic stop is valid under the Fourth Amendment if the stop is based on an observed traffic violation or if the police officer has reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring." *United States v. Eckhart*, 569 F.3d 1263, 1271 (10th Cir. 2009) (quoting *United States v. Botero-Ospina*, 71 F.3d 783, 787 (10th Cir. 1995) (en banc)). The "sole inquiry is whether this particular officer had reasonable suspicion that this particular motorist violated any one of the multitude of applicable traffic and equipment regulations of the jurisdiction." *Id.* (internal quotation marks omitted).

A routine traffic stop constitutes an investigative detention or seizure and invokes the Fourth Amendment's protections against unreasonable searches and seizures. *United States v. Williams*, 403 F.3d 1203, 1206 (10th Cir. 2005). To conduct a traffic stop, "the detaining officer must have an objectively reasonable suspicion that a traffic violation has occurred or is occurring." *United States v. Soto*, 988 F.2d 1548, 1554 (10th Cir. 1993). "In analyzing the constitutionality of a traffic stop under the Fourth Amendment, [this

7

Court] appl[ies] the 'reasonable suspicion' standard for investigative detentions originally set forth in *Terry v. Ohio*." *United States v. Winder*, 557 F.3d 1129, 1133 (10th Cir. 2009) (citing *Terry v. Ohio*, 392 U.S. 1 (1968)).

Here, Dep. Zamudio had ample justification to stop the Durango. Title 47, Okla. Stat. § 11-309(2) provides that, "[a] vehicle shall not be moved from the lane until the driver has first ascertained that the movement can be made with safety and then given a signal, not less than the last one hundred (100) feet traveled by the vehicle, of his or her intention to change lanes." In spite of his assertion that "the turn signal is blinking before the Durango changed lanes" and the speculative calculations included in Defendant's Motion (Doc 59 at 6-7), it is clear from the dashcam video that Acosta-Gwynn was already in the process of changing lanes when she activated her right turn signal, in violation of state law (*Id.;* Ex. 2 at 00:22-00:26). Observation of this driving behavior alone would have provided reasonable suspicion that a traffic violation was occurring, justifying the traffic stop.

Further, Title 47, Okla. Stat. § 1151(A)(5) provides that, "[i]t shall be unlawful for any person to […] operate a vehicle without proper license plate or decal or on which all taxes due the state have not been paid." Dep. Zamudio also noted, that the violation that originally brought the suspect vehicle to his attention was that a law enforcement records check of the temporary tag affixed thereto came back not to a Dodge Durango, but to an International Truck licensed out of Kentucky. (Ex. 1 at 2; Ex. 2 at 01:02-01:10.) The return of the records check gave Dep. Zamudio reasonable suspicion to believe that the

driver was operating the Durango without the proper tag affixed, in violation of state law, also thereby justifying the stop.

Finally, Title 47, Okla. Stat. § 1113(A)(3) provides that, "[t]he operation of a vehicle in this state, regardless of where such vehicle is registered, upon which the license plate is covered, overlaid or otherwise screened with any material, whether such material be clear, translucent, tinted or opaque, shall be a violation of this paragraph." Although not articulated as the reason for the stop (Ex. 2 at 01:02-01:10), Dep. Zamudio noted that the temporary tag was "obstructed by a tinted plastic cover," (Ex. 1 at 2) and a blue cast to the temporary tag is visible as captured by the dashcam (*see generally* Ex. 2). This observation provided further evidence that the driver of the Durango was operating the vehicle in violation of state law, also justifying the stop.

Here, the traffic stop that Dep. Zamudio performed was valid because it was based upon articulable reasonable suspicion that the driver of the vehicle had committed not one but three observed traffic violations. As a result, the evidence obtained during the ensuing search was validly obtained.

## II. The Secondary Search was Justified.

While law enforcement had probable cause to search the Durango both on the roadside and subsequently at CITCO headquarters, Defendant asserts that law enforcement should have obtained a search warrant before proceeding with the secondary search because "[n]o exigent circumstance existed that would make the warrant requirement impractical." (Doc. 59 at 9.)

It is well-established that the odor of marijuana provides law enforcement with probable cause to search a vehicle. *United States v. Morin*, 949 F.2d 297, 300 (10th Cir. 1991) ("This court has long recognized that marijuana has a distinct smell and that the odor of marijuana alone can satisfy the probable cause requirement to search a vehicle or baggage."). It is similarly well-established that officers may search an automobile without a warrant upon a finding of probable cause. *Florida v. White*, 526 U.S. 559, 563-64 (1999) ("[W]hen federal officers have probable cause to believe that an automobile contains contraband, the Fourth Amendment does not require them to obtain a warrant prior to searching the car for and seizing the contraband." (citing *Carroll v. United States*, 267 U.S. 132 (1925)). Further, "the Tenth Circuit has repeatedly held that an officer's detection of the smell of marijuana 'alone establishes probable cause to search a vehicle for the illegal substance.'" *United States v. Stancle*, 184 F.Supp.3d 1249, 1256 (N.D. Okla. 2016) (citing *United States v. Snyder*, 793 F.3d 1241, 1244 (10th Cir.2015)); *see also United States v. Johnson*, 630 F.3d 970, 974 (10th Cir.2010) (holding that officer's detection of "a strong odor of burnt marijuana emanating from the car" subsequent to stopping the defendant for a traffic violation constituted probable cause to search the vehicle).

"A vehicle lawfully in police custody may be searched on the basis of probable cause to believe that it contains contraband, and there is no requirement of exigent circumstances to justify such a warrantless search." *United States v. Johns*, 469 U.S. 478, 484, 105 S. Ct. 881, 885, 83 L. Ed. 2d 890 (1985) (quoting *Michigan v. Thomas,* 458 U.S. 259, 261-262, 102 S.Ct. 3079, 3081, 73 L.Ed.2d 750 (1982) (per curiam); see also Florida v. Meyers, 466 U.S. 380, 104 S.Ct. 1852, 80 L.Ed.2d 381 (1984) (per curiam). Further,

"[t]here is no requirement that the warrantless search of a vehicle occur contemporaneously with its lawful seizure." *Id.* (quoting *Texas v. White,* 423 U.S. 67, 68, 96 S.Ct. 304, 305, 46 L.Ed.2d 209 (1975) (*per curiam*); *Chambers v. Maroney,* 399 U.S. 42, 52, 90 S.Ct. 1975, 1981, 26 L.Ed.2d 419 (1970).) "If probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search." *United States v. Ross*, 456 U.S. 798, 825, 102 S. Ct. 2157, 2173, 72 L. Ed. 2d 572 (1982).

Here, Deputy Zamudio detected the odor of marijuana immediately upon approaching the vehicle in which Defendant was a passenger, which provided the probable cause necessary to justify a search, resulting in the discovery of the drugs within the vehicle. (Ex. 1 at 2; Ex. 2 at 01:15-01:22.) Probable cause did not expire once the deputies temporarily halted the search, resuming again at the CITCO office. Under *Johns*, law enforcement was not required to obtain a warrant before thoroughly examining the Durango and its contents. As such, the fruits of the search were validly discovered.

## CONCLUSION

For the reasons stated above, Defendant's Motion to Suppress should be denied.

Respectfully submitted,

ROBERT J. TROESTER
United States Attorney

s/ Danielle M. Connolly
DANIELLE M. CONNOLLY, OBA #33148
Assistant United States Attorney
210 Park Avenue, Suite 400
Oklahoma City, Oklahoma 73102
Office: (405) 553-8700
Fax: (405) 553-8888
Danielle.Connolly@usdoj.gov

## CERTIFICATE OF SERVICE

This is to certify that on April 12, 2022, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Docket Activity to the following ECF registrant:

Julia C. Summers, Counsel for Brandon Oneal Gwynn.

s/ Danielle M. Connolly
Assistant United States Attorney